THE STATE OF CONNECTICUT *vs.* LAWRENCE FERRONE.

First Judicial District, Hartford, January Term, 1922.
WHEELER, C. J., BEACH, GAGER, CURTIS and BURPEE, Js.

In an information against an accused for having by night in his possession, without lawful excuse, two instruments of housebreaking, in violation of General Statutes, § 6238, the accused was charged with so having in his possession two iron bars.   The court instructed the

The State *v.* Ferrone.

jury that the State must prove that these bars were instruments of housebreaking, that they were in the possession of the accused at the time charged, which was admittedly by night, and that such possession was without lawful excuse. The court further charged that an instrument of housebreaking might be such from its essential nature, that is, one made and designed for the express purpose of housebreaking, or it might be such only temporarily and for a particular purpose, if it was both reasonably adapted for such use and at the time intended or actually used for that purpose. As to possession the court stated that it might be that of an individual or a joint possession of several; and as to the lawful excuse, that if it was true, as claimed by the accused, that the bar was taken along for repairs upon an automobile or any other purpose of that kind, that would be a lawful excuse. *Held* that the court's construction of the statute was clear and accurate.

Evidence that the accused's companions in an automobile at the time of his arrest were searched, and that upon them were found several loaded revolvers, was relevant and competent, as was everything in the car, when the State's claim was that the accused and his companions were, on the occasion in question, engaged jointly in an expedition for the purpose of commiting burglary or other serious crime of a like nature.

Testimony from a lieutenant of police, that pursuant to his orders police officers searched the automobile and brought to him a pistol and a package of bullets, which were laid in evidence, was objectionable as hearsay, since the officers who made the search should have been required to testify.

Statements relevant and material to the issue, made in the hearing of an accused, to which he made no reply, are in general admissible in evidence when the circumstances show that he understood and comprehended them, and the facts are known to him and he had the opportunity to speak and the circumstances naturally called for a reply; but this rule does not apply when the accused is in custody, since the law accords him the right then to remain silent, and his silence cannot be laid in evidence against him. Statements made to the accused under such circumstances are therefore only admissible when they are relevant and material and are also replied to by the accused in such manner that, if not amounting to a confession, the reply complies with the ordinary rules relating to admissions.

Under ordinary circumstances the subsequent exclusion of testimony once admitted will cure any harm from its admission, if the matter is fully and fairly explained to the jury; but whether such exclusion would cure the prejudice to the accused in the ordinary criminal case from the admission of evidence tending to prove that he was a notorious criminal, is questionable.

Evidence was admitted and subsequently excluded, of statements by police officers to the accused after his arrest in New York City, that he had just come out from doing seven years in Sing Sing. *Held* that this evidence was not relevant and material to the charge against the accused, that it was highly prejudicial to him, and that its admission constituted harmful error.

A request to charge that if the jury found the accused to have committed another crime, namely, the taking of gasoline without paying therefor, they should exclude such evidence from their minds, was properly refused, since such evidence was one of the circumstances to be considered by the jury in determining whether the accused was guilty of the essential elements of the crime charged, and the court had made it clear that the accused was not being tried upon any charge concerning the taking of gasoline.

Statements of the State's Attorney in argument to the jury, *held* to have exceeded the generous latitude permitted, and to have been prejudicial to the accused.

Argued January 4th—decided February 21st, 1922.

INFORMATION charging the accused with having burglars' instruments in his possession in the night season, without lawful excuse, brought to the Superior Court in Hartford County and tried to the jury before *Maltbie, J.;* verdict and judgment of guilty, and appeal by the accused. *Error and new trial ordered.*

*Benjamin Slade,* for the appellant (the accused).

*Hugh M. Alcorn,* State's Attorney, and *Newell Jennings,* Assistant State's Attorney, for the appellee (the State).

WHEELER, C. J. The assignments of error concern two rulings on evidence, the failure of the court to charge as requested, to the charge as made, and to portions of the argument of the State's Attorney. We shall take up these assignments in this order, and first briefly outline the nature of the charge and what its proof involved, with a short summary of the essential facts upon which the State relied. In this way the

claimed errors in the rulings made and in the charge as given and as refused, will be more clearly understood.

This case was before us in 96 Conn. 160, 113 Atl. 452. The information is based on General Statutes, § 6238, which reads as follows: "Every person who . . . by night has in his possession, without lawful excuse, the proof of which excuse shall be upon him, any key, picklock, jimmy, jack, bit or other instrument of housebreaking" shall be punished. The instruments of housebreaking which the accused was charged with having in his possession were two iron bars. The court instructed the jury that the three indispensable elements in the State's case were: Whether these bars were instruments of housebreaking? Whether they were in the possession of the accused at the time charged, which was admittedly the night season? Whether they were then in the possession of the accused without lawful excuse?

"An instrument of housebreaking," said the court, "may be such from its essential nature"; that is, "it may be one which is made and designed for the express purpose of housebreaking"; or it "may be one which is such temporarily and for a particular purpose"; and whether such or not would depend upon two considerations: "first, is it one that is reasonably adapted for use in housebreaking; and second, was it at the time intended or actually used for that purpose?" The State claimed to have proved that these bars were in their essential nature instruments of housebreaking, and that if the jury did not so find, they must find that they were instruments of housebreaking because they were adapted to such use; and that the surrounding circumstances disclosed that they were intended for housebreaking on this occasion.

The court further instructed the jury that "possession," as used in the statute, meant having an article or

instrument "under one's control and dominion," and that this might be "that of the individual, or it may be a joint possession of several"; so here, "it might be that you could find that they were in the possession of the entire group of men, because at that time they were animated by a common purpose."

Upon the third question, as to the possession of the instrument of housebreaking without lawful excuse, the proof of which shall be upon the accused, the court instructed the jury: "Now, that needs no explanation, as applied to this case. If it is true, as the defense claims, that these bars were taken along for repairs upon the automobile, or any other purpose of that kind, why, of course, there was a lawful excuse present, no matter how strictly they are instruments of housebreaking or truly they are jimmies, in the opprobrious sense of that term; if they were there for a lawful purpose, then the State fails in proving its case." This construction of the statute was clear and accurate, and no error is predicated upon it.

The State offered evidence to prove that the accused, with four other men, between midnight of February 15th and one o'clock in the morning of the 16th, were riding in an automobile which was owned and kept in Boston, Massachusetts, and when they arrived in Warehouse Point, the automobile was backed up to a Socony gasoline supply-pump near the highway, the door of which was forcibly broken open and gasoline pumped from the pump to the tank of the automobile; the lights upon the automobile were turned out, and when the owner of the pump appeared the occupants of the car boarded it and drove off without paying for the gasoline. After the car had gone one hundred and fifty feet the lights were turned on. The marks on the pump indicated that it had been opened by means of an instrument such as the iron bars hereinafter described,

and which the State claimed to be instruments of housebreaking.

When the automobile reached the Hartford bridge, it was stopped by police officers and the accused, with the other occupants, taken to the police station in Hartford. The accused sat upon the front seat of the automobile. On the floor in front of the front seat of the automobile were found two metal bars, directly under the feet of the accused at the time he was arrested, and these bars the State claimed were instruments of housebreaking, or by reason of the purpose for which they were being carried upon the occasion in question and the use to which it was intended to put them. The State also offered as a witness Lieutenant Weltner of the police department of Hartford, who testified that all of the occupants of the car were searched in the presence of the accused. What was done in making the search as to occupants of the car other than the accused was objected to by counsel for the accused and admitted against his objection. To the ruling he duly excepted. The witness then testified that a loaded revolver was taken from Allen, one of the occupants of this car, and a loaded revolver taken from Ryan, another occupant of the car, and two other revolvers found on the two other occupants, and a loaded cartridge case found on one of these. Everything found in the car or upon the person of any occupant of the car, was relevant and competent evidence. For the State's claim was that "from all the facts and circumstances in evidence" it was a proper inference that "the accused and his companions were on the occasion in question engaged jointly in an expedition for the purpose of committing a burglary or other serious crime of like nature and that the bars, if not technically implements of housebreaking, still were implements reasonably adapted for use in housebreaking and on the occasion in question

were intended to be used for such a purpose," and this offer directly tended to prove this claim.

The State also inquired of this witness if he gave instructions as to the search of the automobile, and he replied he did. He was then inquired of whether his orders were obeyed, and replied, they were. This inquiry was plainly objectionable. So far as appears of record the witness had no knowledge of this subject, all that he could testify to was what the officers detailed to make the search told him they had done. He was then inquired of, "And whether later another pistol was brought to you," and against the objection and exception of the accused, replied "There was." He then was permitted to testify that certain officers brought to him a pistol, and a package of bullets taken from the pistol was laid in evidence. None of this evidence, except as to the fact that instructions were given, was admissible. The officers who made the search should have been required to testify as to the search, as to the articles taken from the car, and as to what was done with them; and if these were handed to Lieutenant Weltner, he could identify them and they might then have been properly laid in evidence.

It may be that subsequent testimony made these erroneous rulings harmless; the record is too indefinite upon this subject to enable us to reach a conclusion as to this. Another ruling excepted to by the accused was that admitting the conversation of Higgins, a detective sergeant of the New York Police Department, with the accused after his arrest in New York City, Higgins testified: "I said: 'I am going to take you to head-quarters and verify the fact that the picture of yours is there and you are wanted.' He said: 'No, I was never arrested in my life before.' I said: 'I'll have to taken you over anyway' . . . While waiting for a . . . car, Moog [a fellow officer of Higgins] . . . said to Ferrone:

'Why, you just came out from doing seven years in Sing Sing.'" Counsel for the accused renewed his objection, and the court said: "Under the rule, I don't think there is much question about its admissibility." After further argument by counsel, the court ruled that the conversation did not constitute an admission on the part of the accused and was therefore inadmissible, and ordered this evidence stricken out, and stated that the explanation of the court's ruling was for the benefit of the jury more than for counsel.

In the charge the court instructed the jury: "You certainly would not be justified, and I am sure you will not consider any testimony which once offered the court has later directed to be stricken out." The court referred to this testimony of Higgins. The court's first ruling was predicated upon the rule stated by it in a ruling made in the course of Weltner's testimony, viz: "The effect of statements made in the presence of a man, or conduct in which he is directly concerned, is determined by his reaction to those statements or to what is done; but, as preliminary to that, it is, of course, necessary and proper to show what was said and what was done." The fundamental error of the trial court was its failure to note that the conversation with the accused occurred while he was under arrest and with the officer who held him in custody. Statements made by an accused, not by way of confession, are admitted in proof of the independent facts involved in the statements, when such facts are relevant and material to the inquiry, that is, when they lead to inference of guilt. And statements made in his hearing, which are relevant and material, to which he makes no reply, may be given in evidence as indicative of conduct on his part, when the circumstances show that he heard, understood and comprehended the statement, and the facts are known to him and he had the opportunity to speak and the

circumstances naturally called for a reply from him. *Commonwealth* v. *Kenney,* 53 Mass. (12 Met.) 235, 237. But when the accused is in custody, our law accords him the right to reply to question or statement, or to remain silent. His silence under such circumstances cannot be laid in evidence against him. *Commonwealth* v. *McDermott,* 123 Mass. 440, 441; 2 Wharton's Crim. Ev. (10th Ed.) § 679. If the accused make a statement or declaration not in the nature of a confession, either of his own volition, or in response to question or query while he is under arrest, the statement or declaration will be admissible if it comply with the ordinary rules relating to admissions. It must be relevant and material to the subject of the charge against the accused. The question or query which invited the statement or declaration of the accused; the parts of the conversation with him which explain or make clear the meaning of his own share in the conversation, are admissible, for they complete what would be otherwise a meaningless or half understood expression. They furnish the background and perspective. But they are not admissible unless they are responded to by the accused, nor unless they are relevant and material to the charge against the accused. *Commonwealth* v. *Kenney,* 53 Mass. (12 Met.) 235, 237. Evidence tending to show the commission of other crime on the part of the accused, or facts disclosing his bad character or repute, are not material or relevant to the charge against the accused, and should never be permitted to be introduced; for its purpose can be none other than to prejudice the jury against the accused, and hence to deny him the fair trial which the law guarantees him of being proven guilty of the crime with which he stands charged by evidence which our law accepts. None of the conversation between Higgins and the accused was admissible. None of it related to

the charge against the accused. It was obviously
intended for the purpose of picturing the accused as a
notorious criminal.

In *State* v. *Ferrone*, 96 Conn. 160, 173, 113 Atl. 452,
upon a related matter, we said: "It cannot be believed
that an accused man would ever have a fair trial,
resulting in a verdict not affected by prejudice or by
considerations by which the jury should not be influ-
enced, if, during that trial, allegations that he has
twice before been convicted of State prison crimes have
been read to the jury, and evidence of his former con-
victions has been placed before them. It is beyond
question that knowledge of such facts must necessarily
prejudice the minds of his triers against the accused,
and cause him more serious injury than that which he
would suffer from any improper remarks of the State's
Attorney. No one would claim that in a trial for a
specific crime evidence of another crime committed by
the accused could be admitted for the purpose of prov-
ing his guilt of the crime alleged." *State* v. *Joseph*,
96 Conn. 637, 641, 115 Atl. 85.

In *Commonwealth* v. *Campbell*, 155 Mass. 537, 538,
30 N. E. 72, a police officer was permitted to testify as
to statements of an accused as to the larceny charge
against him and as to other facts which tended to show
that the accused was a professional criminal. Mr. Jus-
tice Barker reiterated the view of the court upon this
ruling: "The court erred in permitting Watts to testify
to the whole of his conversations with the defendant.
The government should have been allowed to introduce
only such portions of the conversations as pertained
to the alleged offence. Not only was the witness not so
instructed, but he was allowed to testify to separate
conversations with the defendant, having no relation
to the crime charged, and apparently introduced with
the sole purpose of showing that the defendant was

a notorious criminal." In *Commonwealth* v. *Keyes*, 77 Mass. (11 Gray) 323, 325, the court said: "But if, during the same interview between the witness and the party [accused], other subjects of conversation or discussion are introduced, remote and distinct from that which is the object of inquiry or investigation, it is obvious that whatever may be said concerning them can have no tendency to illustrate, vary or explain it. Everything pertaining to these additional and extraneous matters should therefore be rejected as irrelevant and useless."

The admission of testimony and its subsequent exclusion would under ordinary circumstances if the matter were fully and fairly explained to the jury, cure the harm done. In the ordinary criminal case we question whether the subsequent exclusion of the admission of evidence tending to prove that an accused was a notorious criminal can remove from the consideration of the jury this fact. Such a fact must prejudice the jury against an accused and deprive him of the fair trial which our law gives him and our courts must see that he gets. *People* v. *Conrow*, 200 N. Y. 356, 367, 93 N. E. 943; *People* v. *Brown*, 110 N. Y. App. Div. 490, 493, 96 N. Y. Supp. 957.

As to the requests to charge, the accused has no cause for complaint in the manner in which the court presented to the jury his request that "no prejudicial inferences should be drawn by you because he failed to testify." The request that if the jury find the commission of another crime, namely, the taking of gasoline without paying therefor, they should exclude such evidence from their minds, was properly refused. That was one of the circumstances in the case from consideration of which, in connection with the other circumstances, the jury were to determine whether the accused was guilty of the essential elements of this

charge. The jury could not have mistaken the use to which they might put this fact. They knew that the case against the accused which they were trying was not for stealing gasoline or breaking into a gasoline tank, for the court at the beginning of its charge made this entirely clear.

The other requests to charge and the portions of the charge complained of, do not furnish reasonable ground of complaint.

Eleven of the assignments of error are based upon portions of the State's Attorney's argument. In at least three particulars these errors are well taken and must be held to have been prejudicial. In paragraph 37 of the finding the query: "Where did the $755 come from, and the Liberty Bonds that were in this man's possession? Has that been explained to you?" was a patent suggestion to the jury that the money and bonds found upon the accused were obtained by him unlawfully. It was the injection into the case by way of argument, instead of by detective sergeant Higgins, of the fact that the accused was a criminal. In paragraph 41 of the finding, the State's Attorney's argument proceeds: "I never in my life, gentlemen of the jury, or in this court-room, or any court-room, have seen the man with the burglar's face that appears upon that man that you are trying to-day. How would you like to wake up some morning and find him at the foot of your bed with a loaded gun in his hand? What chance have you? What chance would the police officers have had if there were not four of them?" And in paragraph 42 the argument proceeds: "When Ferrone, the burglar here, started out that night with his companions, they were bent upon burglary, and they had the two implements to accomplish it with, and the men who interrupted them in the pursuit of that unlawful act would be shot in their tracks like a

dog." The unfairness of such argument so character-
izes it as to relieve the court from the duty of comment
upon it.

In the former trial of this case, we once again ex-
pressed with fulness and definiteness our view as to the
duty and the privilege of the State's Attorney in the
conduct of the State's case. Nothing that we there said
or have ever said will narrow or hamper the State's
Attorney in the proper performance of his duty. Nor
will it prevent him from using his full powers in pre-
senting the State's cause with ability, zeal, power and
intrepid devotion.

In the enforcement of our rules we have not and
shall not forget the ardor of advocacy and the excite-
ment of trials and the temptation which is apt under
such circumstances upon occasion, to carry away even
experienced counsel. We repeat: "Counsel must be
allowed a generous latitude in arguments, as the limits
of legitimate argument and fair comment cannot be
determined precisely by rule and line, and something
must be allowed for the zeal of counsel in the heat of
argument." *State* v. *Laudano,* 74 Conn. 638, 646, 51
Atl. 860.

But when every reasonable allowance is made, the
trial court as well as the court of review must insist
that fairness in the trial and in the argument shall be
observed. Otherwise justice cannot be done. What
was said in *State* v. *Ferrone,* 96 Conn. 160, 173, 113 Atl.
452, must never be forgotten: "The purpose of a
criminal trial in this State is not more to punish the
guilty than to discharge the innocent."

There is error and a new trial is ordered.

In this opinion the other judges concurred.